**HOBCO, INC., Plaintiff-Appellee,**

v.

**TALLAHASSEE ASSOCIATES, Defendant-Appellant.**

**No. 85–3897.**

United States Court of Appeals, Eleventh Circuit.

Jan. 8, 1987.

Richard W. Gladstone, II, Pittsburgh, Pa., for defendant-appellant.

Bill R. Hutto, John D. O'Brien, Panama City, Fla., for plaintiff-appellee.

Before HILL and VANCE, Circuit Judges, and BROWN *, Senior Circuit Judge.

VANCE, Circuit Judge:

## I. FACTS

This is an appeal from the district court's judgment granting appellee, Hobco, Inc., an equitable lien against a Tallahassee office building owned by appellant, Tallahassee Associates, releasing Hobco from its rental guaranty agreement and rejecting appellant's breach of warranty and misrepresentation claims against Hobco. The relevant sequence of events began with Hobco's 1983 sale of the Tallahassee office building to a syndicating company, 21st Century Equity, Inc. (hereinafter called "21st Century"), which in turn assigned its

---

* Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designa-tion.

rights under the contract of sale to Tallahassee Associates. 21st Century is not a party to this suit. We affirm.

The office building consists of approximately 143,500 square feet of rentable space. Hobco constructed this building with funds loaned by First Federal Savings and Loan Association of Panama City (hereinafter called "First Federal") and gave First Federal a mortgage for $7.5 million. Hobco agreed to sell the building to 21st Century. During negotiations a Hobco officer, Alan Torledsky, suggested that the building could be filled with private tenants who would "feed off" the federal agencies which already occupied about half of the building. After interviewing prospective tenants, Torledsky concluded that the plan would not work, but he did not communicate his change of mind to 21st Century until after the sale. 21st Century had previously purchased nine other buildings which it conveyed to limited partnerships in a manner similar to the present transaction. Neither Hobco nor its principals had ever sold an office building.

Under a sales agreement dated October 31, 1983 (hereinafter "the October 31 Agreement"), 21st Century agreed to pay a sales price of $10 million. 21st Century was to take title subject to the existing $7.5 million first mortgage and agreed to pay an additional $2.5 million cash. Hobco guaranteed for two years a $7.00 per square foot rental for the space it had not yet rented and during those two years was to receive the excess of any rental above $7.00 per square foot. 21st Century or its assignee retained a right of reasonable approval of new tenants. In addition Hobco warranted: "Seller has not withheld from Buyer any known information concerning the Property, the Leases or Operating Contracts which is significant and adverse to the Property, said Leases or Operating Contracts." Hobco also agreed to complete construction on the building in return for a $300,000 promissory note.

One month later 21st Century assigned all rights under the October 31 Agreement to Tallahassee Associates for an agreed price of $11,075,000. Tallahassee Associates agreed to pay $2,281,000 cash and executed a wrap-around mortgage to the order of 21st Century in the amount of $8,794,000. Tallahassee Associates is a limited partnership formed by Tom Evans and Aubrey Gladstone to syndicate the building.[1] At the time of the sale Evans and Gladstone also owned 21st Century. In all relevant transactions between Tallahassee Associates and 21st Century, Evans and Gladstone acted for both parties.

A bewildering array of assignments and pledges accompanied this series of transactions.[2] First Federal had retained approximately $1.1 million of the dispersed loan proceeds in the form of a certificate of deposit issued in Hobco's name but pledged as a "rental achievement holdback." This holdback was retained as a precaution against failure to rent the building at a rate sufficient to service the debt. First Federal agreed to release $450,000 of this sum as soon as the State of Florida finalized its lease for 22,000 square feet. First Federal would release the $650,000 balance as the building attracted tenants at $10.50 per square foot. If a portion of the premises was not leased at $10.50 per square foot within 18 months, First Federal could apply the corresponding portion of the holdback against the outstanding debt as a prepayment.

The October 31st Agreement required Hobco to secure its obligation under the $7.00 per square foot rental guaranty by pledging this same certificate of deposit to 21st Century or its assignee as security for the guaranty. Prior to closing, Hobco pledged this certificate of deposit to Talla-

1. Evans and Gladstone owned only 1% of Tallahassee Associates, but exercised full control as its general partners.

2. Although not directly at issue in this appeal, Hobco's construction contract with 21st Century gave rise to an equally confusing series of transactions—construction holdback, assignment, promissory note and subsequent off-setting credits—which did little to clarify the already confusing nature of the conveyance of the building.

hassee Associates, 21st Century's assignee. Under the terms of this second pledge, both Hobco and Tallahassee Associates would jointly request release of these funds as Hobco fulfilled the lease guaranty. The assignment further provided that Tallahassee Associates would not be obligated under the pledge of the certificate of deposit.

When the entire deal closed on November 29, 1983, title passed directly from Hobco to Tallahassee Associates, and the building was left encumbered with three mortgages. Hobco remains liable for the $7.5 million first mortgage to First Federal. Tallahassee Associates executed a second, nonrecourse mortgage in favor of Hobco. This second mortgage secures 21st Century's obligation to pay off the balance of the first mortgage owed to First Federal. Although neither 21st Century nor Tallahassee Associates assumed the first mortgage, Hobco can get its building back if 21st Century defaults. The third mortgage is the "wrap-around" note Tallahassee Associates executed in favor of 21st Century. This wrap-around note requires Tallahassee Associates to adhere to a fixed schedule of monthly installments for thirty-five years. Prepayment of First Federal's $7.5 million first mortgage does not appear to affect the installments Tallahassee Associates must pay the holder of this wrap-around note.

Arguments between the parties erupted almost immediately after closing. Hobco proposed to lease 32,577 square feet to the Department of Labor at $7.00 per square foot. Tallahassee Associates refused, arguing that this low price would stigmatize the building. When the State of Florida finalized its lease, Tallahassee Associates denied Hobco's request for the release of the corresponding $450,000 held under the rental achievement holdback. The parties were unable to secure tenants at $10.50 per square foot. On February 28, 1985, at the end of the eighteen month term of the rental achievement agreement, First Federal applied the $1.1 million certificate of deposit held as a rental achievement hold-back against the $7.5 million first mortgage.

## II. THE RENTAL GUARANTY

■ The district court found that Tallahassee Associates had violated the rental guaranty agreement by unreasonably withholding its approval from the proposed Department of Labor lease. Accordingly, the court reduced Hobco's liability under the rental guaranty by the $228,039 attributable to the proposed lease. Tallahassee Associates argues that it did not approve the lease because Hobco refused to provide the paved parking spaces the lease required. Tallahassee Associates contends that the lower court ignored Florida's Statute of Frauds, Fla.Stat.Ann. § 725.01 (West 1969), and mistakenly concluded that the unsigned lease bound Hobco to provide this parking.

The Florida Statute of Frauds is not controlling. The district court did not enforce an unsigned lease. It merely noted that a dispute over parking was unlikely since Hobco had proposed a lease which would have committed it to provide parking. Concern over the rental rate, not parking, was the true reason for the rejection. The district judge found that Tallahassee Associates rejected this lease because it considered the $7.00 per square foot rental too low. A letter from Tallahassee Associates to Hobco states several reasons for the rejection, all of which relate to the $7.00 rental rate. Since the rental guaranty itself secures rentals at $7.00 per square foot, the district court's finding that Tallahassee Associates unreasonably rejected this price is not clearly erroneous.

## III. BREACH OF WARRANTY AND MISREPRESENTATION

Tallahassee Associates' breach of warranty and misrepresentation claims center on the "feed-off" marketing plan suggested by Alan Torledsky. Tallahassee Associates argues that Hobco induced the sale of the building by withholding the fact that it had already tested this marketing plan and found it unworkable. Although the Octo-

ber 31 agreement contains a provision expressly warranting that Hobco had not withheld "significant and adverse" information, the lower court held that Torledsky's statements represented only an opinion of possible marketing use. The court held, as a finding of fact, that the parties did not intend the express warranty to encompass such speculation.

The record supports this finding. Gladstone had purchased at least nine other buildings and had used almost identical provisions in his other sales contracts. When asked at trial about the purpose of such warranties, Gladstone explained that his computer analysis required complete access to information on income and expenses in order to produce an accurate estimate of a building's value. The lower court was justified in finding that the warranty ensured the accurate flow of tax and financial information but did not extend to Torledsky's marketing theories.

■ The court was also required to reject Tallahassee Associates' breach of warranty and misrepresentation claims as a conclusion of law. Torledsky's state of mind may not be the subject of a warranty. *See, e.g., Keating v. DeArment*, 193 So.2d 694, 697 (Fla.Dist.Ct.App.1967), *cert. denied*, 201 So.2d 549 (Fla.1967), *overruled in part on other grounds, Brown v. Hall*, 221 So.2d 454, 457 (Fla.Dist.Ct.App.1969); *Sanitary Linen Service Co. v. Alexander Proudfoot Co.*, 304 F.Supp. 339, 343 (S.D. Fla.1969), *aff'd*, 435 F.2d 292 (5th Cir.1970) (warranty may not attach to estimates of potential savings). The breach of warranty claim must rest upon Torledsky's failure to disclose the discouraging results of his contacts with potential "feed-off" tenants.

■ Under Florida law, an express warranty may arise only where justifiable reliance upon assertions or affirmations is part of the basis of the bargain. *See, e.g., Thursby v. Reynolds Metals Co.*, 466 So.2d 245, 250 (Fla.Dist.Ct.App.1984); *Escambia Chemical Corp. v. Industrial-Marine Supply Co.*, 223 So.2d 773, 775 (Fla.Dist. Ct.App.1969); *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092

(11th Cir.1983). Tallahassee Associates has given us no reason to believe that it relied on, or was even aware of, Torledsky's survey of potential "feed-off" tenants. From prior dealings with government tenants, Gladstone possessed the experience and expertise to independently evaluate whether a feed-off principle would work. The record reveals an atmosphere of distrust where Tallahassee Associates undertook special precautions against fraudulent information, including consultations with an independent appraiser. The district court reasonably found that the breach of warranty claim was meritless because Tallahassee Associates did not rely upon Torledsky. The misrepresentation claim fails on a similar analysis. *See Lance v. Wade*, 457 So.2d 1008, 1011 (Fla. 1984) (other party must rely upon misrepresentation of material fact to his detriment).

## IV. THE EQUITABLE LIEN

Tallahassee Associates does not contest the lower court's finding that the funds in the rental achievement holdback belonged to Hobco. When First Federal applied this certificate of deposit to the $7.5 million first mortgage, Hobco lost $1.1 million. The setoff of these funds against the first mortgage reduced the amount due First Federal on that mortgage. This reduction benefits the holder of the third, wraparound mortgage, who is obligated to pay the principal and interest on the $7.5 million first mortgage. At closing, the holder of this wrap-around note was 21st Century.

Tallahassee Associates has already repaid Hobco $450,000 of the rental achievement holdback. This sum represents that portion of the rental achievement holdback First Federal was willing to release when the State of Florida finalized its lease for 22,000 square feet. The October 31 agreement gave Tallahassee Associates, as 21st Century's assignee, the right to refuse the release of these funds pledged to secure the rental guaranty to 21st Century. The district court held that Tallahassee Associate's refusal to agree to this release was unjustified.

Hobco's loss of the $650,000 balance presents a more difficult problem. The lower court awarded Hobco an equitable lien on the building for the $650,000 balance plus interest. Tallahassee Associates contests this award.

There are two ways to create an equitable lien in Florida: 1) "special circumstances creating it because of right and justice;" and 2) "a written contract showing an intention to charge property with a particular debt." *Town of Naples v. Naples Improvement Corp.*, 147 Fla. 94, 2 So.2d 383, 385 (1941); *see also Jones v. Carpenter*, 90 Fla. 407, 106 So. 127, 129 (1925). In arguing that the district court erred in awarding the equitable lien, Tallahassee Associates relies exclusively on cases of the first category, where the plaintiff sought an equitable lien based upon a showing of unjust enrichment. *See, e.g., Diversified Commercial Developers v. Formrite, Inc.*, 450 So.2d 533 (Fla.Dist.Ct. App.1984) (breach of construction contract); *Hagen v. Florida Drug, Inc.*, 402 So.2d 57 (Fla.Dist.Ct.App.1981) (breach of a lease agreement); *Chase Manhattan Bank v. S/D Enterprises*, 353 So.2d 131 (Fla.Dist. Ct.App.1977) (bank unjustly enriched at expense of other creditors); *Phelps v. T.O. Mahaffey, Inc.*, 156 So.2d 900 (Fla.Dist.Ct. App.1963) (broken promise to pay contractor). Accordingly, Tallahassee Associates complains that Florida law requires that it be unjustly enriched and argues that Florida law insists upon a finding of wrongdoing by the defendant before a court may impose an equitable lien. *See, e.g., Chase Manhattan Bank v. S/D Enterprises*, 353 So.2d 131, 133 (Fla.Dist.Ct.App.1977).

If we are to find unjust enrichment or wrongdoing, we must look beyond Tallahassee Associates to 21st Century. Tallahassee Associates does not benefit from a reduction of the first mortgage because the wrap-around note requires Tallahassee Associates to meet a fixed schedule of payments regardless of any prepayment of the First Federal mortgage. The lower court found that Tallahassee Associates was not at fault for Hobco's loss of the $650,000 balance. First Federal would release this money only if the building attracted tenants at $10.50 per square foot, but no tenants willing to pay this amount were found. To discern a benefit for Tallahassee Associates or to link it to wrongdoing, we would have to hold that 21st Century is Tallahassee Associates' alter ego.

"[T]he corporate veil may not be pierced absent a showing of improper conduct." *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1121 (Fla.1984). Hobco asserts that Evans and Gladstone had set out on a calculated course to have the rental achievement holdback set off against the first mortgage. It might be appropriate to pierce the corporate veil if Evans and Gladstone organized 21st Century and Tallahassee Associates to mislead or defraud creditors. *Id.* at 1120. We need not reach this issue because we conclude that the case before this court involves the second means by which an equitable lien may be created in Florida.

Cases of this second category require nothing beyond a written contract expressing an intent to encumber specific property. *See, e.g., Margarum v. J.S. Christie Orange Co.*, 37 Fla. 165, 19 So. 637 (1896) (unsuccessful effort to execute valid mortgage deed can create an equitable lien); *Meyer v. Schwartz*, 391 So.2d 310 (Fla.Dist. Ct.App.1980) (equitable lien arose when property owner was killed in accident after writing letter promising to execute second mortgage); *Amacher v. Keel*, 358 So.2d 889 (Fla.Dist.Ct.App.1978) ("assignment" of land can give rise to an equitable lien, though insufficient to create mortgage); *see also Holmes v. Dunning*, 101 Fla. 55, 133 So. 557, 558 (1931) ("an equitable mortgage may be constituted by any writing from which the intent to do so may be gathered"). To affirm the award of the equitable lien we must find that: 1) 21st Century had an obligation to repay Hobco because the setoff of the $650,000 rental achievement holdback reduced the amount 21st Century owed First Federal on the first mortgage; and 2) the October 31 Agreement indicates that the parties in-

tended the second mortgage to secure such an obligation.

The first finding depends on whether 21st Century contracted to specifically pay $7.5 million, or whether it had only agreed to pay Hobco's outstanding debt to First Federal as it matured. At trial Aubrey Gladstone admitted that 21st Century had agreed to pay off the first mortgage, and the October 31 Agreement includes the total unpaid balance of the first mortgage, $7.5 million, in the purchase price. No term in the October 31 Agreement would exclude the amount of money in the holdbacks from the purchase price. If the parties intended that a setoff of the rental achievement holdback should benefit 21st Century and reduce the sales price, the rental guaranty would not make sense. Under the terms of the first mortgage, the setoff would occur if the building could not attract tenants at $10.50 per square foot. There would be no need to pledge the rental achievement holdback to guaranty rentals at $7.00 per square foot because these funds would benefit 21st Century even without this assignment. We find that 21st Century committed itself specifically to pay $7.5 million, the entire amount outstanding on the first mortgage at the time of sale.

We next turn to the question of whether the October 31 Agreement contemplates a second mortgage that would secure this obligation in its entirety. After closing Hobco remained liable on the first mortgage since 21st Century and Tallahassee Associates were careful to avoid individual liability for themselves. Hobco's only protection was to be the building itself. The original version of paragraph 3.5(f) stated: "Buyer shall provide at Closing a Second Mortgage on the Property in favor of those persons or entities remaining liable on the existing First Mortgage and Note without any amount being stated in said Second Mortgage but with a default occurring thereunder upon an uncured default continuing to exist on the First Mortgage and Note for a period of sixty (60) days after written notice to Buyer from Seller of a default under the First Mortgage and Note." Thus as originally written, paragraph 3.5(f) referred to a second mortgage which would secure only the money actually due First Federal. Under the original version of paragraph 3.5(f), the second mortgage would not secure holdbacks applied to the first mortgage.

The final version of paragraph 3.5(f) continues in a different hand: "Said mortgage shall secure Buyer's obligation to pay and comply with the First Mortgage and Note and to secure all payment obligations to Seller hereunder." Bill Hutto, Hobco's attorney, testified that the parties added this provision after a bitter dispute in order to "secure all payment obligations that arose out of the contract, period." Tallahassee Associates has given us no reason to doubt Hutto's testimony, or, for that matter, the plain language of the contractual term. We find that 21st Century promised, in amended paragraph 3.5(f), a second mortgage to secure the purchase price, including the entire amount outstanding on the first mortgage at the time of sale. When the parties executed the mortgage contemplated by the October 31 agreement, the mortgage instrument lacked the sweeping language in paragraph 3.5(f).[3] This led the lower court to find that the second mortgage as executed covered only the amount due First Federal.[4]

█ The October 31 agreement evinces an intent to secure the entire purchase price with a second mortgage. We hold that an equitable lien arose securing that portion of the purchase price not secured by the second mortgage as executed. This portion of the purchase price corresponds to any prepayment made under the terms

---

**3.** On its face, the second mortgage secures the following: (a) 21st Century's obligations under the assignments of the rental achievement and construction holdbacks; (b) the payment of the $300,000 promissory note; (c) various cove-

nants and agreements as contained in the mortgage; and (d) "the repayment of the indebtedness evidenced by the [first mortgage]."

**4.** We are not asked to review this finding.

of the rental achievement holdback agreement. Since "equitable liens arise at the time of the transaction from which they spring," *Blumin v. Ellis*, 186 So.2d 286, 295 (Fla.Dist.Ct.App.1966), *cert. denied* 189 So.2d 634 (Fla.1966), subsequent purchasers are subject to their effect unless the property in question is purchased without notice. *Id.* at 295–96. This of course is not the case here. When Tallahassee Associates purchased the building from 21st Century, Evans and Gladstone were on both sides of the transaction.

We acknowledge that an equitable lien in favor of Hobco will not disadvantage Evans, Gladstone or 21st Century. The wraparound mortgage requires Tallahassee Associates to "pay all ... impositions attributable to the Property which may attain a priority over this Mortgage." The imposition of the lien, in effect, restructures the sale between 21st Century and Tallahassee Associates so that Tallahassee Associates pays an additional $650,000 for the building. Whether this result works an injustice must be determined in litigation between Tallahassee Associates and others.

AFFIRMED.